## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NOS. 4:16-cr-385-S (SDTX) |
| | § | 2:16-cr-143 (EDLA) |
| SUNNY JOSHI, | § | |
| a.k.a. Sharad Ishwarlal Joshi, | § | |
| a.k.a. Sunny Mahashanker Joshi, | § | |
| | § | |
| Defendant. | § | |

### PLEA AGREEMENT

The United States of America, by and through its attorneys, Abe Martinez, Acting United

States Attorney for the Southern District of Texas, and Kenneth A. Blanco, Acting Assistant

Attorney General for the Department of Justice, Criminal Division, the defendant, Sunny Joshi,

a.k.a. Sharad Ishwarlal Joshi, Sunny Mahashanker Joshi ("Defendant"), and Defendant's counsel,

pursuant to Rule 11(c)(1)(A) and (B) of the Federal Rules of Criminal Procedure, state that they

have entered into an agreement, the terms and conditions of which are as follows:

### Defendant's Agreement

1.    Defendant agrees to plead guilty to Count Three of the Superseding Indictment in

Criminal Case No. 4:16-cr-385-S, which charges Defendant with a violation of Title 18, United

States Code, Section 1956(h) (Money Laundering Conspiracy).   Pursuant to Rule 20 of the

Federal Rules of Criminal Procedure, Defendant also agrees to plead guilty to Count One of the

Indictment in Criminal No. 2:16-cr-143 filed in the Eastern District of Louisiana, which charges

Defendant with Title 18, United States Code, Section 1425(a) (Fraudulent Procurement of

Naturalization).   The defendant, by entering this plea, agrees that he is waiving any right to have

the facts that the law makes essential to the punishment either charged in the indictments, or proved to a jury beyond a reasonable doubt.

## Punishment Range

2. The **statutory** maximum penalty for a violation of Title 18, United States Code, Section 1956(h), is imprisonment of not more than 20 years and a fine of not more than $250,000.00 or twice the gross gain or loss from the offense. Additionally, Defendant may receive a term of supervised release after imprisonment of up to three years. *See* Title 18, United States Code, sections 3559(a)(3) and 3583(b)(2). Defendant acknowledges and understands that if he should violate the conditions of any period of supervised release which may be imposed as part of his sentence, then Defendant may be imprisoned for the entire term of supervised release, without credit for time already served on the term of supervised release prior to such violation. *See* Title 18, United Stated Code, sections 3559(a)(3) and 3583(e)(3). Defendant understands that he cannot have the imposition or execution of the sentence suspended, nor is he eligible for parole.

3. The **statutory** maximum penalty for a violation of Title 18, United States Code, Section 1425(a), is imprisonment of not more than 10 years and a fine of not more than $250,000.00. Additionally, upon conviction, the Court shall revoke, set aside and declare void the final order admitting the Defendant to United States' citizenship, and shall declare his certificate of naturalization to be cancelled, pursuant to Title 8, United States Code, Section 1451(e). The Court shall also order the Defendant to surrender his certificate of naturalization. There may be additional adverse consequences to the Defendant's immigration status in a subsequent administrative proceeding. In addition, Defendant may receive a term of supervised release after imprisonment of up to three years. *See* Title 18, United States Code, sections

3559(a)(3) and 3583(b)(2).   Defendant acknowledges and understands that if he should violate the conditions of any period of supervised release which may be imposed as part of his sentence, then Defendant may be imprisoned for the entire term of supervised release, without credit for time already served on the term of supervised release prior to such violation.   *See* Title 18, United Stated Code, sections 3559(a)(3) and 3583(e)(3).   Defendant understands that he cannot have the imposition or execution of the sentence suspended, nor is he eligible for parole.

### Mandatory Special Assessment

4.   Pursuant to Title 18, United States Code, Section 3013(a)(2)(A), immediately after sentencing, Defendant will pay to the Clerk of the United States District Court a special assessment in the amount of one hundred dollars ($100.00) per count of conviction.   The payment will be by cashier's check or money order, payable to the Clerk of the United States District Court, c/o District Clerk's Office, P.O. Box 61010, Houston, Texas 77208, Attention: Finance.

### Immigration Consequences

5.   Defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States.   Defendant understands that if he is not a citizen of the United States, by pleading guilty he may be removed from the United States, denied citizenship, and denied admission to the United States in the future.   Defendant's attorney has advised Defendant of the potential immigration consequences resulting from Defendant's plea of guilty.

3

## Cooperation

6.      If requested by the United States, but only if so requested, the Defendant agrees to cooperate with the United States.   Defendant further agrees to persist in his plea through sentencing, fully cooperate with the United States, and not oppose the forfeiture of assets contemplated in this agreement.   Defendant understands and agrees that the United States will request that sentencing be deferred until that cooperation is complete.

7. Defendant understands and agrees that "fully cooperate," as that term is used herein, includes providing all information relating to **any** criminal activity known to Defendant, including but not limited to conspiracy, wire fraud, postal fraud, identity theft, money laundering, immigration violations, and passport fraud.   Defendant understands that such information includes both state and federal offenses arising therefrom.   In that regard:

(a)      Defendant agrees that this plea agreement binds only the Acting United States Attorneys for the Southern District of Texas and the Eastern District of Louisiana, the Acting Assistant Attorney General for the Department of Justice, Criminal Division and Defendant; it does not bind any other United States Attorney or any other unit of the Department of Justice;

(b)      Defendant agrees to testify truthfully as a witness before a grand jury or in any other judicial or administrative proceeding when called upon to do so by the United States.   Defendant further agrees to waive his Fifth Amendment privilege against self-incrimination for the purpose of this agreement;

(c)      Defendant agrees to voluntarily attend any interviews and conferences as the United States may request;

(d)      Defendant agrees to provide truthful, complete and accurate information and testimony and understands any false statements made by the defendant to the Grand Jury or at any court proceeding (criminal or civil), or to a government agent or attorney, can and will be prosecuted under the appropriate perjury, false statement, or obstruction statutes;

(e)      Defendant agrees to provide to the United States all documents in his possession or under his control relating to all areas of inquiry and investigation;

4

(f)     Should the recommended departure, if any, not meet Defendant's expectations, the Defendant understands that he remains bound by the terms of this agreement and cannot, for that reason alone, withdraw his plea; and

(g)     Defendant agrees that his obligation under this section is a continuing one, and will continue after sentencing until all investigations and/or prosecutions to which the Defendant's cooperation may be relevant have been completed.

### Waiver of Appeal and Collateral Review

8.   Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal the conviction and sentence imposed.   Defendant is also aware that Title 28, United States Code, Section 2255, affords the right to contest or "collaterally attack" a conviction or sentence after the judgment of conviction and sentence has become final.   Defendant knowingly and voluntarily waives the right to appeal or "collaterally attack" the conviction and sentence, as well as any fines, restitution, and forfeiture orders, the court might impose except that Defendant does not waive the right to raise a claim of ineffective assistance of counsel on direct appeal, if otherwise permitted, or on collateral review in a motion under Title 28, United States Code, Section 2255.   In the event Defendant files a notice of appeal following the imposition of the sentence or later collaterally attacks his conviction or sentence, the United States will assert its rights under this agreement and seek specific performance of these waivers.

9.   In agreeing to these waivers, Defendant is aware that a sentence has not yet been determined by the Court.   Defendant is also aware that any estimate of the possible sentencing range under the Sentencing Guidelines that he may have received from his counsel, the United States or the Probation Office, is a prediction and not a promise, did not induce his guilty plea, and

5

is not binding on the United States, the Probation Office or the Court.   The United States does not make any promise or representation concerning what sentence Defendant will receive.   Defendant further understands and agrees that the United States Sentencing Guidelines are "effectively advisory" to the Court.   *See United States v. Booker*, 543 U.S. 220 (2005).   Accordingly, Defendant understands that, although the Court must consult the Sentencing Guidelines and must take them into account when sentencing Defendant, the Court is not bound to follow the Sentencing Guidelines nor sentence Defendant within the calculated guideline range.

10.   Defendant understands and agrees that each and all waivers contained in the Agreement are made in exchange for the concessions made by the United States in this plea agreement.

### The United States' Agreements

11.   The United States agrees to each of the following:

(a)   If Defendant pleads guilty to Count Three of the Superseding Indictment in Criminal Case No. 4:16-cr-385-S and Count One of the Indictment in Criminal Case No. 2-16-cr-143, persists in that plea through sentencing, and if the Court accepts this plea agreement, the United States will move to dismiss any remaining counts of the Superseding Indictment in Criminal No. 4:16-cr-385-S at the time of sentencing;

(b)   At the time of sentencing, the United States agrees not to oppose Defendant's anticipated request to the Court and the United States Probation Office that he receive a two (2) level downward adjustment pursuant to section 3E1.1(a) of the United States Sentencing Guidelines, should Defendant accept responsibility as contemplated by the Sentencing Guidelines; and

(c)   If Defendant qualifies for an adjustment under section 3E1.1(a) of the United States Sentencing Guidelines, the United States agrees not to oppose Defendant's request for an additional one-level departure based on the timeliness of the plea or the expeditious manner in which Defendant provided complete information regarding his role in the offense (if Defendant's offense level is 16 or greater);

6

(d)     The United States agrees to take no position on whether the sentences for the two respective offenses the Defendant is pleading guilty to under the terms of this plea agreement should run concurrently or consecutively; and

(e)     At the time of sentencing, the United States agrees not to oppose Defendant's position that for purposes of calculating the advisory United States Sentencing Guidelines range, the foreseeable loss attributable to him is in excess of $3.5 million but did not exceed $9.5 million, understanding that the Court is not bound by such agreement or recommendation

### Agreement Binding - Southern District of Texas, Eastern District of Louisiana and Department of Justice, Criminal Division Only

12.   The United States Attorney's Offices for the Southern District of Texas, the Eastern District of Louisiana, and the Department of Justice, Criminal Division agree that they will not further criminally prosecute Defendant for offenses arising from conduct charged in the indictments.   This plea agreement binds only the United States Attorney's Offices for the Southern District of Texas and Eastern District of Louisiana, the Department of Justice, Criminal Division and Defendant.   It does not bind any other United States Attorney's Office or division of the Department of Justice.   The United States Attorney's Office for the Southern District of Texas and the Department of Justice, Criminal Division will bring this plea agreement and the full extent of Defendant's cooperation to the attention of other prosecuting offices, if requested.

### United States' Non-Waiver of Appeal

13.   The United States reserves the right to carry out its responsibilities under Guidelines sentencing.   Specifically, the United States reserves the right:

(a)     to bring its version of the facts of this case, including its evidence file and any investigative files, to the attention of the Probation Office in connection with that office's preparation of a presentence report;

(b)     to set forth or dispute sentencing factors or facts material to sentencing;

7

(c)     to seek resolution of such factors or facts in conference with Defendant's counsel and the Probation Office;

(d)     to file a pleading relating to these issues, in accordance with section 6A1.2 of the United States Sentencing Guidelines and Title 18, United States Code, section 3553(a); and

(e)     to appeal the sentence imposed or the manner in which it was determined.

### Sentence Determination

14.     Defendant is aware that the sentence will be imposed after consideration of the United States Sentencing Guidelines and Policy Statements, which are only advisory, as well as the provisions of Title 18, United States Code, Section 3553(a).   Defendant nonetheless acknowledges and agrees that the Court has authority to impose any sentence up to and including the statutory maximum set for the offense(s) to which Defendant pleads guilty, and that the sentence to be imposed is within the sole discretion of the sentencing judge after the Court has consulted the applicable Sentencing Guidelines.   Defendant understands and agrees that the parties' positions regarding the application of the Sentencing Guidelines do not bind the Court and that the sentence imposed is within the discretion of the sentencing judge.   If the Court should impose any sentence up to the maximum established by statute, or should the Court order any or all of the sentences imposed to run consecutively, Defendant cannot, for that reason alone, withdraw a guilty plea, and will remain bound to fulfill all of the obligations under this plea agreement.

### Rights at Trial

15.   Defendant understands that by entering into this agreement, he surrenders certain rights as provided in this plea agreement.   Defendant understands that the rights of a defendant include the following:

8

(a)      If Defendant persisted in a plea of not guilty to the charges, Defendant would have the right to a speedy jury trial with the assistance of counsel.   The trial may be conducted by a judge sitting without a jury if Defendant, the United States, and the Court all agree.

(b)      At a trial, the United States would be required to present witnesses and other evidence against Defendant.   Defendant would have the opportunity to confront those witnesses and his/her attorney would be allowed to cross-examine them.   In turn, Defendant could, but would not be required to, present witnesses and other evidence on his own behalf.   If the witnesses for Defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court; and

(c)      At a trial, Defendant could rely on a privilege against self-incrimination and decline to testify, and no inference of guilt could be drawn from such refusal to testify.   However, if Defendant desired to do so, he could testify on his own behalf.

### Factual Basis for Guilty Plea

16.   Defendant is pleading guilty because he is in fact guilty of the charges contained in Count Three of the Southern District of Texas Superseding Indictment and Count One of the Eastern District of Louisiana Indictment.   If this case were to proceed to trial, the United States could prove each element of the offenses beyond a reasonable doubt.   The following facts, among others would be offered to establish Defendant's guilt:

Money Laundering Conspiracy

a.      Beginning in 2011, agents with Homeland Security Investigations, the Treasury Inspector General for Tax Administration, the Department of Homeland Security-Inspector General, and elsewhere, began investigating and ultimately identified a complex fraud and money laundering scheme in which individuals from call centers located in Ahmedabad, India impersonated government tax and immigration officials, and others, and called potential victims located in the United States to defraud them out of money, often threatening them with arrest, imprisonment, fines, or deportation if they did not pay alleged taxes or penalties to the government.

9

The scam callers convinced the victims to pay or transfer often large amounts of money to the scammers through various methods, per their specific instructions. In order to liquidate the proceeds derived from victims of this scheme, numerous U.S.-based individuals (also known as "runners") operating in various geographic locations were employed by the India-based call center conspirators. The conspirators liquidated the victims' funds in various ways and in a closely coordinated fashion between the call centers, runners, and associates via email, text and instant messaging services such as WhatsApp. In a typical scenario, call centers directed runners to purchase general purpose reloadable (GPR) cards and transmit the unique card number to India-based conspirators who registered the cards online or via telephone using the misappropriated personal identifying information (PII) of U.S. citizens. The India-based conspirators then loaded these GPR cards with funds obtained from numerous victims. The runners used the GPR cards in their possession, loaded with victims' funds, to purchase money orders they deposited into the bank account of another person, as directed. This fraud activity often occurred on the same day, usually within hours; too quickly for the victim to report the fraud to law enforcement and/or financial institutions in an effort to successfully freeze and recover their funds. For their services, the runners would earn a specific fee or a percentage. In addition to laundering victims' funds using GPR cards, runners also received victims' funds via MoneyGram and Western Union wire transfers using fictitious identities/false identification documents, direct bank deposits by victims into the accounts of witting and unwitting bank account holders, and iTunes or other gift cards that victims purchased.

   b.      During the course of the investigation, agents identified defendant SUNNY JOSHI as a runner operating in the Houston, Texas area in a crew that included, among others, RAJESH

BHATT (a/k/a MANOJ or MIKE JOSHI) and NILESH PANDYA.

      c.    From in or around 2012 and continuing through on or about the date of the Superseding Indictment, in the Southern District of Texas and elsewhere, within the jurisdiction of this Court, defendant SUNNY JOSHI, along with other co-defendants in Criminal Case No. 4:16-cr-385-S, knowingly combined, conspired, confederated and agreed with each other to commit an offense against the United States in violation of Title 18, United States Code, Section 1956(h) (Money Laundering Conspiracy): to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, the scheme to commit wire fraud in violation of Title 18, United States Code, Section 1343, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

      d.    During the course of his involvement in the conspiracy, defendant SUNNY JOSHI engaged in various activities in furtherance of the conspiracy, including but not limited to:

- Extensively communicating via electronic means with India-based codefendants KUNAL NAGRANI and SUBISH EZHAVA, associated with operating organizational defendant CALL MANTRA, regarding the scheme;

- Operating at the direction of NAGRANI and EZHAVA to conduct scam fund liquidation activity, including by purchasing GPR cards and using those cards,

funded by co-conspirators with scam victim funds, to purchase money orders and deposit them in third party bank accounts, while keeping a percentage of the scam proceeds for himself as profit;

- Coordinating with codefendant RHAJESH BHATT (a/k/a MANOJ or MIKE JOSHI) regarding domestic scam fund liquidation activities, and directing the activities of other runners in the Houston area including codefendant NILESH PANDYA;

e.     Specifically, defendant SUNNY JOSHI exchanged e-mails (primarily using email account sunny143sq@gmail.com) and text messages with codefendant SUBISH EZHAVA a/k/a CHRIS WOODS using email address chrislast902@yahoo.com, in which they discussed the operation of the scam including monthly expenses related to GPR card purchases, money orders, MagicJack accounts, and commission structures.  JOSHI and EZHAVA exchanged over one hundred e-mails from September 2012 through April 2015 containing information related to the scam, including PII of individuals whose identities were misappropriated to register GPR cards, invoices for services, monthly activity reports, lists of credit card numbers and names, copies of deposit slips, bank account information, deposit instructions and images of GPR cards.  The monthly reports in the emails reflect a percentage commission before "expenses", which included MagicJack, GPR cards, and money order fees, etc., used to facilitate the operation (for example, according to a December 2013 report, JOSHI reported a commission of $49,617 in one month.) Spreadsheets exchanged reflected how particular GPR cards were used and spent down, and that some cards were "BLOCKED."

f.      Defendant SUNNY JOSHI also exchanged over one hundred emails with

12

codefendant KUNAL NAGRANI, using email account kunal.callmantra@gmail.com, between November 2009 and March 2014, containing information related to the scam, including PII of individuals whose identities were misappropriated to register GPR cards, incorporation paperwork for Indian Back Office Process (BPO) services operating in concert with U.S.-based LLCs, invoices for services, monthly activity reports, lists of credit card numbers, copies of deposit slips, bank accounts and deposit instructions.

g.     Defendant SUNNY JOSHI kept information on his personal electronic devices consistent with the scam and his money laundering activities, including contact information for codefendants KUNAL NAGRANI, SUBISH EZHAVA, and RAJESH BHATT (a/k/a MANOJ or MIKE JOSHI), monthly and annual reports with amounts and commissions earned, and various expenses consistent with the operation of the scam.

h.     Defendant SUNNY JOSHI and codefendant RHAJESH BHATT (a/k/a MANOJ or MIKE JOSHI) were interviewed in June 2012 by United States Secret Service (USSS) agents. During this interview, JOSHI and BHATT discussed opening businesses, checking accounts and merchant services accounts for the purpose of processing debt collection payments on behalf of KUNAL NAGRANI/CALL MANTRA, with whom they had entered into a contractual agreement in October 2010 to engage in alleged "debt collection" activities.   After the agents told them about the fraudulent nature of the activity involving NAGRANI, they denied knowing that the call centers were defrauding customers.   Agents advised JOSHI and BHATT to end their relationship with NAGRANI and to report any additional invoices they received from him.   However, JOSHI and BHATT resumed working with NAGRANI, EZHAVA and CALL MANTRA several weeks after they were interviewed by USSS Houston.   JOSHI and BHATT did not report their resumed

contact with NAGRANI to USSS.

      i.    Between on or about August 12, 2013 through August 13, 2013, CALL MANTRA callers telephonically extorted victim Kimsea S., a resident of San Jose, CA, of $6,500 by purporting to be IRS employees, threatening her and her husband's arrest and demanding payment for alleged tax violations.   On or about those same dates, CALL MANTRA callers directed victim Kimsea S. to purchase seven (7) Green Dot MoneyPak cards with the stored value of $6,500 and to provide the MoneyPak PINs to the callers.   On or about those same dates, CALL MANTRA conspirators transferred victim Kimsea S.'s scammed funds from the MoneyPaks to six (6) GPR cards registered using misappropriated PII of five (5) U.S. citizens.   On or about August 14, 2013, co-defendant SUNNY SUREJA accessed one of the GPR cards containing victim Kimsea S.'s scammed funds using his Magic Jack number to load funds from an unidentified victim from Woodside, NY.   On or about September 2, 2013, codefendant SUBISH EZHAVA using chrislast902@yahoo.com emailed defendant SUNNY JOSHI at sunny143sq@yahoo.com.   The email contained a spreadsheet detailing $241,479.80 in GPR card transactions processed by JOSHI using 118 GPR cards during the month of August 2013.   Included on the list was a GPR card funded by victim Kimsea S. ending in number 1773 that had been used on or about August 13, 2013, by CALL MANTRA conspirators in two (2) transactions in Missouri City, TX.   On or about September 2, 2013, EZHAVA using chrislast902@yahoo.com emailed RAJESH BHATT (a/k/a MANOJ or MIKE JOSHI) at mikeno101@yahoo.com.   The email contained a spreadsheet detailing $239,180.79 in GPR card transactions processed by BHATT using 116 different GPR cards during the month of August 2013.   Included on the list were two (2) of the GPR cards funded by victim Kimsea S., which were used in three (3) transactions in Houston, TX on August 12,

2013.

j.      On or about October 24, 2013, CALL MANTRA callers telephonically extorted victim Gary B., residing in Ukiah, CA of $9,930 by fraudulently purporting to be IRS employees, threatening legal action and demanding payment for alleged tax violations.   On or about the same date, CALL MANTRA callers directed victim Gary B. to purchase 13 Green Dot MoneyPaks and transmit the PINs to the callers.   On or about the same date, CALL MANTRA conspirators transferred victim Gary B.'s MoneyPaks to five (5) different GPR cards registered using appropriated PII of four (4) individuals.   On or about the same date, the GPR cards loaded with Gary B.'s scammed funds were used to make purchases in Southgate, MI, Houston, TX, and Stafford, TX.   CALL MANTRA conspirators used a GPR card to purchase $2,000 in money orders that were subsequently deposited, on October 30, 2013, into a BOA account for HSHM LLC.   On or about November 1, 2013, SUBISH EZHAVA using chrislast902@yahoo.com emailed defendant SUNNY JOSHI at sunny143sq@yahoo.com.   The email showed $306,363.45 in GPR card purchases by JOSHI during the month of October 2013.   Included on the list were three (3) GPR cards funded by victim Gary B.   On or about the same date, EZHAVA using chrislast902@yahoo.com sent an email to RAJESH BHATT (a/k/a MANOJ or MIKE JOSHI) at mikeno101@yahoo.com.   The email showed $293,874.90 in GPR card purchases by BHATT during the month of October 2013.   Included on the list was a GPR card funded by victim Gary B.

k.      On or about September 30, 2014, CALL MANTRA callers telephonically extorted victim Jeffrey G., residing in San Diego, CA, of $4,176 by fraudulently purporting to be IRS employees, threatening his arrest and demanding fines and fees for alleged tax violations.   On or

about the same date, CALL MANTRA callers directed victim Jeffrey G. to purchase five (5) Blackhawk Network Reloadit cards with the stored valued of $4,176 and provide the PINs associated with those Reloadit cards to the callers. On or about the same date, CALL MANTRA conspirators transferred victim Jeffrey G.'s extorted $4,176 from the five (5) Reloadit cards to two (2) PayPower GPR cards which had been purchased at a Randall's Store in Sugar Land, TX on September 29, 2014 and registered in the name of an individual with the initials J.H. of Castle Rock, CO. On or about the same date, NILESH PANDYA liquidated one of the GPR cards (-1817) at a Walmart store in Pearland, TX for three (3) MoneyGram money orders totaling $2,293.04. The second GPR card (-9695) was not vacated. On about October 3, 2014, SUBISH EZHAVA using chrislast902@yahoo.com sent an email to defendant SUNNY JOSHI at sunny143sq@yahoo.com titled "Report for the Month of September 2014". The email stated, "Hello Sir, Report for the Month of September 2014 attached. Thank you,", and included an Excel spreadsheet attachment titled "Sunny Report for Sep 2014". The Excel spreadsheet contained a list of 90 GPR cards which were vacated between September 1, 2014 and September 30, 2014 for a total of $169,394.30. The spreadsheet also contained both GPR cards which received victim Jeffrey G.'s extorted funds. The spreadsheet indicated that the liquated card (-1817) was "picked" on September 30, 2014 for $2,293.04 while the non-vacated card (-9695) was "blocked" on the same date. On or about October 5, 2014, JOSHI, using sunny143sq@yahoo.com, sent EZHAVA an email at chrislast902@yahoo.com titled "Final report 09-01-14 to 09-30-13". The text of the email contained an accounting of JOSHI's activities for the month of September 2014 to include totals, balance, deposits made and expenses. JOSHI listed "card's,Magicjack 50 pc,mail,money order ,m=ney order fees,gas" (sic) as expenses.

16

l.        On or about February 10, 2014, CALL MANTRA callers telephonically extorted victim Diana N., a resident of Monroe, NY, of $3,562 by purporting to be Treasury Inspector General for Tax Administration (TIGTA) employees, threatening her and her husband's arrest and demanding payment for alleged tax violations.   On or about the same date, CALL MANTRA callers directed victim Diana N. to purchase eight (8) Green Dot MoneyPaks with the stored value of $3,562 and to provide the MoneyPak PINs to the callers.   On or about the same date, CALL MANTRA conspirators transferred Diana N.'s scammed funds from the MoneyPaks to two (2) GPR cards registered with misappropriated PII of two U.S. citizens.   On or about the same date, conspirators vacated the GPR cards with Diana N.'s scammed funds in Houston, TX, Nashville, TN, and Racine, WI.   The transaction in Racine, WI occurred at co-defendant MITESHKUMAR and ASMITABEN PATEL's gas station.   On or about March 1, 2014, SUBISH EZHAVA using chrislast902@yahoo.com emailed defendant SUNNY JOSHI at sunny143sq@yahoo.com.   The email contained a spreadsheet detailing approximately $308,927.53 in GPR card transactions processed by JOSHI using 179 GPR cards in February 2014.   Included on the list was one of the GPR cards funded by victim Diana N.   On or about March 4, 2014, JOSHI using sunny143sq@gmail.com emailed KUNAL NAGRANI at kunal.callmantra@gmail.com.   The subject line of the email was "Final Report (02/01/2014 to 02/28/14)".   JOSHI reported $308,920 in GPR card transactions during this period and receiving a commission of $38,616.   JOSHI also reported making various deposits during the period including a $50,000 payment to "METISH PATEL" (sic).   Previously, on or about February 10, 2014 and February 20, 2014, JOSHI mailed packages via USPS to MITESH PATEL, consistent with JOSHI's report that he paid MITESH a sum of money in February 2014.

Green Dot Seizure

m.      The primary method in which the Defendant and his co-conspirators received the fraud proceeds was via the aforementioned GPR cards. In particular, the scammers typically requested that victims obtain Green Dot MoneyPaks, Blackhawk Network Reloadit packs or similar products that could be used to facilitate the transfer of funds to the scammers. The MoneyPak or Reloadit pack is a paper card that can be purchased and loaded with cash at retail locations. MoneyPak or Reloadit packs have a scratch off PIN that the scammers obtained from the victims over the telephone. Using the PIN information, the scammers transferred the entire balance on the paper cards to the corresponding GPR cards of various types held by runners in the conspiracy.

n.      In order to use the Green Dot Debit Card, cardholders must complete a registration process intended to verify the user's identity. The cardholder must provide their complete name, address, date of birth, social security number, and telephone number, in order to register the card. Once Green Dot verifies that the registration information is valid, the cardholder is able to use the debit card like any other bank debit card to make purchases and withdraw cash. Once the debit card is registered, it can receive money transfers from Green Dot MoneyPak cards online or by phone. In this case, Defendant, his co-defendants, and co-conspirators in India registered the Green Dot debit cards using the PII of identity theft victims.

o.      During the course of the offense, victims purchased thousands of MoneyPak cards to facilitate the transfer of funds from the victims to the Defendant and his co-conspirators. The Defendant and his-conspirators then had the funds transferred from the MoneyPak cards to Green Dot Debit Cards using Green Dot's automated telephone service.

18

p.      Agents analyzed about seventy email accounts, information stored on electronic devices, records provided by Green Dot, and the transaction activity of thousands of Green Dot cards, to trace proceeds of the offense to approximately 1,000 Green Dot cards. Defendant stipulates that the funds seized from Green Dot on or about March 23, 2017, which total $545,721.60, are fraud proceeds and funds involved in or traceable to the offense for which he is pleading guilty.

Naturalization Fraud

q.      Defendant SUNNY JOSHI knowingly procured naturalization, U.S. citizenship, and a certificate of naturalization and citizenship for himself using the name "Sunny Mahashankar Joshi." Defendant did so willfully and contrary to law by making numerous false representations in his Application for Naturalization (Form N-400) and in an interview by U.S. immigration officials in connection with his application.

r.      Defendant, a citizen and national of India, applied for asylum in the United States, in June 1992, as "Sharad Ishwarlal Joshi" and using the birthdate October 8, 1970. His application, filed in New Jersey, was denied because he did not adequately demonstrate his eligibility for asylum. In February 1994, Defendant, as Sharad Ishwarlal Joshi, was ordered deported.

s.      Defendant did not leave the United States in compliance with the order; instead, he remained in the United States and, in March 1999, applied for Lawful Permanent Resident (LPR) status under a different identity, "Sunny Mahashankar Joshi" and using the birthdate, "08-10-1970." On his application for LPR status, Defendant falsely answered "No" to the question, "*Have you ever been deported from the U.S., or removed from the U.S. at government expense,*

19

*excluded within the past year or are you now in exclusion or deportation proceedings?*", when in fact, Defendant had entered deportation proceedings and had an order of deportation pending against him, under his prior identity, Sharad Ishwarlal Joshi. Defendant's application for LPR status was granted.

t.      Defendant, as "Sunny Mahashankar Joshi", filed an Application for Naturalization (Form N-400) on or about July 20, 2005, and participated in an interview by U.S. immigration officials in connection with his application on or about August 14, 2006. Based on his responses to the N-400 and corresponding interview, Defendant's application for naturalization was approved. On September 25, 2006, Defendant participated in an Oath of Naturalization ceremony and was issued Certificate of Naturalization Number 28925605, in the Eastern District of Louisiana.

u.      Defendant made several false statements in his N-400, and confirmed these false statements at his interview, to conceal the fact he had previously applied for and had been denied status in the United States under the name "Sharad Ishwarlal Joshi" and had an outstanding order of removal against him under that identity.

v.      Defendant provided biographical information in support of his N-400, including his name, birthdate, and A-file number, which was inconsistent with the identity Defendant used in a 1992 application for asylum, which had been denied, and under which he had an outstanding order of removal. Defendant also provided documentation in support of his N-400, which identified him as "Sunny Mahashankar Joshi," "Sunny M. Joshi," or "Sunny Joshi," and noted his date of birth as "8/10/70." Defendant did not provide his alternative identity, "Sharad Ishwarlal Joshi," to immigration authorities considering his applications for LPR status or for naturalization under

"Sunny Mahashankar Joshi."

      w.    Defendant also knowingly and falsely answered "*No*" to the following questions on

his N-400:

- Question 23, "*Have you EVER given false or misleading information to any U.S. government official while applying for an immigration benefit or to prevent deportation, exclusion, or removal?*"

- Question 25, "*Are removal, exclusion, rescission or deportation proceedings pending against you?*"

- Question 27, "*Have you EVER been ordered to be removed, excluded, or deported from the United States?*"

- Question 28, "*Have you EVER applied for any kind of relief from removal, exclusion or deportation?*"

      x.    Near the end of the application, Form N-400 requires the applicant to "certify, under

penalty of perjury under the laws of the United States of America, that this application, and the

evidence submitted with it, are all true and correct."   Defendant signed below this certification as

"Sunny Joshi."   Additionally, at the time of the naturalization application interview, Form N-400

requires the applicant to "swear (affirm) and certify under penalty of perjury under the laws of the

United States of America that I know the contents of this application for naturalization subscribed

to me . . . are true and correct to the best of my knowledge and belief."   The signature below this

certification reads, "Sunny Mahashankar Joshi."

      y.    Defendant's misrepresentations, made under oath, were willful, material, and

knowingly designed to conceal the fact that he had an outstanding order of removal against him

under a different identity which could jeopardize his naturalization application.   Defendant

understands that a conviction for naturalization fraud will result in the cancellation of the resulting

naturalization certificate, per Title 8, United States Code, Section 1451(e).

      This stipulation does not attempt to set forth every aspect of the Defendant's involvement

in the case, but rather to set forth those facts necessary to serve as a factual basis for the Defendant's guilty plea in this case.

## Breach of Plea Agreement

17.   If Defendant should fail in any way to fulfill completely all of the obligations under this plea agreement, the United States will be released from its obligations under the plea agreement, and Defendant's plea and sentence will stand.   If at any time Defendant retains, conceals, or disposes of assets in violation of this plea agreement, or if Defendant knowingly withholds evidence or is otherwise not completely truthful with the United States, then the United States may move the Court to set aside the guilty plea and reinstate prosecution.   Any information and documents that have been disclosed by Defendant, whether prior to or subsequent to this plea agreement, and all leads derived therefrom, will be used against Defendant in any prosecution.

## Restitution, Forfeiture, and Fines – Generally

18.   This Plea Agreement is being entered into by the United States on the basis of Defendant's express representation that he will make a full and complete disclosure of all assets over which he exercises direct or indirect control, or in which he has any financial interest. Defendant agrees not to dispose of any assets or take any action that would effect a transfer of property in which he has an interest, unless Defendant obtains the prior written permission of the United States.

19.   Defendant agrees to make complete financial disclosure by truthfully executing a sworn financial statement (Form OBD-500 or similar form) within 14 days of signing this plea agreement.   Defendant agrees to authorize the release of all financial information requested by the United States, including, but not limited to, executing authorization forms permitting the

United States to obtain tax information, bank account records, credit histories, and social security information.   Defendant agrees to discuss and answer any questions by the United States relating to Defendant's complete financial disclosure.

20.   Defendant agrees to take all steps necessary to pass clear title to forfeitable assets to the United States and to assist fully in the collection of restitution and fines, including, but not limited to, surrendering title, executing a warranty deed, signing a consent decree, stipulating to facts regarding the transfer of title and the basis for the forfeiture, and signing any other documents necessary to effectuate such transfer.   Defendant also agrees to direct any banks which have custody of his assets to deliver all funds and records of such assets to the United States.

21.   Defendant understands that forfeiture, restitution, and fines are separate components of sentencing and are separate obligations.

### Restitution

22.   Defendant agrees to pay full restitution to the victim(s) regardless of the count(s) of conviction.   Defendant understands and agrees that the Court will determine the amount of restitution to fully compensate the victim(s).   Defendant agrees that restitution imposed by the Court will be due and payable immediately and that Defendant will not attempt to avoid or delay payment.   Subject to the provisions of paragraph 8 above, Defendant waives the right to challenge in any manner, including by direct appeal or in a collateral proceeding, the restitution order imposed by the Court.

### Forfeiture

23.   Defendant stipulates and agrees that any property, real or personal, involved in or traceable to the offense of conviction, as listed in the Superseding Indictment's Notice of Forfeiture

(and in any supplemental Notices), is subject to forfeiture, and Defendant agrees to the forfeiture

of that property. That property includes, but is not limited to:

Seizure of $545,721.60 from Green Dot Corporation on or about March 23, 2017

For purposes of entering said order of forfeiture, Defendant acknowledges that a nexus exists

between the assets specified above and the criminal offense to which Defendant is pleading guilty.

24.     The parties agree that the amount of property involved in the money laundering

conspiracy to which the Defendant is pleading guilty, in violation of 18 U.S.C. § 1956(h), that he

handled but did not retain is $4,852,746.38 in specified unlawful activity proceeds.   The parties

further agree that, as to this amount, the defendant acted as an intermediary who handled but did

not retain the specified unlawful activity proceeds.   The parties further agree that the Defendant,

in committing the conspiracy, conducted three or more separate transactions involving $100,000

or more in any twelve month period.   Defendant stipulates and agrees to the entry of an order for

substitute assets against him and in favor of the United States of America at the time of sentencing.

Defendant stipulates and admits that one or more of the conditions set forth in Title 21, United

States Code, Section 853(p), exists.   Specifically, the parties agree that the proceeds the Defendant

did not retain have been transferred, sold to, or deposited with a third party, have been placed

beyond the jurisdiction of the court, and have been commingled with other property which cannot

be divided without difficulty, as a result of the Defendant's own acts or omissions.   Defendant

agrees to forfeit any of his property, or his interest in property, up to the value of any unpaid portion

of the forfeiture order, until the order is fully satisfied.

25.     Defendant agrees to forfeit and abandon all of the defendant's interest in all items

seized by law enforcement officials during the course of their investigation.   Defendant agrees to

24

waive any and all interest in any asset which is the subject of a related administrative or judicial forfeiture proceeding, whether criminal or civil, federal or state.  With regard to all forfeitable assets, the defendant agrees to take all steps necessary to ensure that the property is not hidden, sold, wasted, destroyed, or otherwise made unavailable for forfeiture. In addition, the defendant agrees not to file a Statement of Interest, Offer in Compromise, Answer, claim, or petition for remission for such asset in any administrative or judicial proceeding that may be initiated or that has been initiated. To the extent that the defendant has filed a Statement of Interest, Offer in Compromise, Answer, claim, or petition for remission for any such asset, the defendant hereby immediately withdraws that filing.

26.    Defendant consents to the order of forfeiture becoming final as to Defendant immediately following this guilty plea, pursuant to Federal Rule of Criminal Procedure 32.2(b)(4)(A).

27.    Subject to the provisions of paragraph 8 above, Defendant waives any and all constitutional, statutory, and equitable challenges in any manner (including direct appeal, habeas corpus, or any other means) to any disposal of such property carried out in accordance with this Plea Agreement on any grounds.  The defendant acknowledges that assets (listed or unlisted in this agreement) may have been forfeited administratively prior to the execution of this agreement, and the defendant hereby waives any interest in such assets; all constitutional, legal, and equitable claims to such assets; and all defenses to the forfeiture of such assets in any proceeding, including proper notice, timeliness of the notice, innocent ownership, defenses arising in connection with any provision of 18 U.S.C. § 983, or excessive fines or punishment.  The defendant also waives the requirements of Fed. R. Crim. P. 43(a) with respect to the imposition of any forfeiture sanction

25

carried out in accordance with this Plea Agreement. The defendant further agrees to hold the United States, its agents and employees harmless from any claims whatsoever in connection with the seizure or disposal of such property. The defendant acknowledges that the United States will dispose of such property and that procedures governing such disposal are for the benefit of the United States and do not confer any rights whatsoever upon him.

**Fines**

28.   Defendant understands that under the Sentencing Guidelines the Court is permitted to order Defendant to pay a fine that is sufficient to reimburse the government for the costs of any imprisonment or term of supervised release, if any. Defendant agrees that any fine imposed by the Court will be due and payable immediately, and Defendant will not attempt to avoid or delay payment. Subject to the provisions of paragraph 8 above, Defendant waives the right to challenge the fine in any manner, including by direct appeal or in a collateral proceeding.

**Complete Agreement**

29.   This written plea agreement, consisting of 29 pages, including the attached addendum of Defendant and his attorney, constitutes the complete plea agreement between the United States, Defendant, and Defendant's counsel. No promises or representations have been made by the United States except as set forth in writing in this plea agreement. Defendant acknowledges that no threats have been made against him and that he is pleading guilty freely and voluntarily because he is guilty.

30.   Any modification of this plea agreement must be in writing and signed by all parties.

Filed at _____Houston_____, Texas, on __October 27, 2017__, 20_17_.

_____
Defendant

Subscribed and sworn to before me on ____October 27____, 20_17_.

DAVID J. BRADLEY, Clerk
UNITED STATES DISTRICT CLERK

By: _____
Deputy United States District Clerk

APPROVED:

Abe Martinez
Acting United States Attorney

By: _____          _____
S. Mark McIntyre                                         David Adler
Craig M. Feazel                                          Attorney for Defendant
Assistant United States Attorney
Southern District of Texas

Kenneth A. Blanco
Acting Assistant Attorney General

___/s/_____
J. Michael Sheckels
Mona N. Sahaf
Trial Attorneys
U.S. Department of Justice
Criminal Division
Human Rights and Special Prosecutions

___/s/_____
Amanda Wick
Trial Attorney

27

U.S. Department of Justice
Criminal Division
Money Laundering and Asset Recovery Section

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NOS. 4:16-cr-385-S (SDTX) |
| | § | 2:16-cr-143 (EDLA) |
| SUNNY JOSHI, | § | |
| a.k.a. Sharad Ishwarlal Joshi, | § | |
| a.k.a. Sunny Mahashanker Joshi, | § | |
| | § | |
| Defendant. | § | |

## PLEA AGREEMENT -- ADDENDUM

I have fully explained to Defendant his rights with respect to the pending indictments.  I have reviewed the provisions of the United States Sentencing Commission's Guidelines Manual and Policy Statements and I have fully and carefully explained to Defendant the provisions of those Guidelines which may apply in this case.  I have also explained to Defendant that the Sentencing Guidelines are only advisory and the court may sentence Defendant up to the maximum allowed by statute per count of conviction.  Further, I have carefully reviewed every part of this plea agreement with Defendant.  To my knowledge, Defendant's decision to enter into this agreement is an informed and voluntary one.

_____          10/27/17
Attorney for Defendant               Date

I have consulted with my attorney and fully understand all my rights with respect to the indictment pending against me.  My attorney has fully explained, and I understand, all my rights with respect to the provisions of the United States Sentencing Commission's Guidelines Manual which may apply in my case.  I have read and carefully reviewed every part of this plea agreement with my attorney.  I understand this agreement and I voluntarily agree to its terms.

_____          10/27/17
Defendant                            Date

29